**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TERRA BOOKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) Case No: 09 C 1996 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cole |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**MEMORANDUM AND ORDER**

The plaintiff, Valerie Booker, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her minor daughter, Terra Booker's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1383(c)(3). Ms. Booker asks the court to reverse and remand the Commissioner's decision or remand for consideration of additional evidence, while the Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Ms. Booker applied for SSI on behalf of her daughter, Terra, on January 7, 2005. (Administrative Record ("R.") 168-70, 181). The application was denied initially and upon reconsideration. (R. 66-85). Ms. Girondi continued pursuit of the claim by filing a timely request for hearing on February 10, 2006. (R. 86-87).

An administrative law judge ("ALJ") convened a hearing on May 4, 2007, at which Ms. Booker and her daughter, represented by counsel, appeared and testified. (R. 895-937). On May 31, 2007, the ALJ issued a decision denying the application for SSI, because Terra did not have an impairment or combination of impairments that met, equaled or functionally met the Listings. (R. 53-65). Ms. Booker sought a review of the decision from the Appeals Council and submitted some additional evidence, which the Appeals Council found did not provide a basis for changing the ALJ's decision. It denied the request for review and the ALJ's decision became the final decision of the Commissioner on January 29, 2009. (R. 5-8). *See* 20 C.F.R. §§ 404.955; 404.981. The plaintiff has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE

### A.
### Evidence before the ALJ

Terra was born on January 19, 1990, and was seventeen years old at the time of the ALJ's decision. (R. 56). She has a history of psychological struggles, and has undergone a great number of evaluations resulting in nearly twenty different diagnoses. (R. 56). Among these are a learning disability, an obsessive-compulsive disorder, a bipolar disorder, and attention-deficit disorder. (R. 56, 291, 327, 347, 419, 459, 471, 586, 796).

At school, Terra was placed in an Individualized Education Program in 2004. It was noted that her behavior impeded her learning or the learning of her classmates. (R. 225). She needed special instruction and accommodation in language arts and mathematics. (R. 225). That meant individual instruction, explanation, and encouragement. (R. 226). Because of her emotional state, she required breaks. (R. 226). She would be graded under modified criteria in view of her problems. (R. 232).

In April of 2005, Terra's math teacher, Colleen O'Hare, noted an exceptional degree of absenteeism, including absences for counseling session and homebound instruction. (R. 213). She had slight problems in comprehending math problems, expressing ideas in written form, and learning new material. (R 214). She required individual attention and explanation – the math class was an "intensive instruction class" – and encouragement and feedback during tasks. (R. 215). Terra had obvious problems with focusing and finishing tasks and with completing assignments. (R. 215). She was easily distracted and had to be prompted to return to tasks. (R. 215). She needed individual explanation before starting an assignment. (R. 215). She also had obvious problems with seeking attention appropriately and expressing anger. (R. 216). Terra also had difficulty being patient and using coping skills to deal with the school environment. (R. 218). She refused to take her medications and was anxious about school being stressful. (R. 218).

In January of 2007, Terra's English teacher, who had known her for three years and saw her five day a week, reported on how Terra's impairments affected her in class. Ms. Fritsch felt Terra was markedly limited in her ability to acquire and use information,

3

able only to see things superficially and unable to provide a depth of analysis expected at her age. (R. 849). She was extremely limited in her ability to attend and complete tasks, as she required constant support and reassurance during the process. (R. 849). Terra was moderately limited in her interaction with others, because she had so little confidence she would limit her interactions and exposures to new situations. (R. 849). Her anxiety and depression had a powerful impact on her expenditure of energy. (R. 847). She experienced a great deal of stress over deadlines and needed constant support. (R. 846). Her anxiety caused her to miss days of school or leave early when her stress level became too much for her. (R. 846). She sometimes fell asleep in class. (R. 845). She was afraid to let go of her book bag, clutching it to her during class. (R. 845). Her attention span was short and she was easily distracted. (R. 845).

Terra underwent a consultative evaluation with Dr. Allan Nelson that the disability agency arranged on June 28, 2005. During the interview, she was depressed and irritable, had a low tolerance for frustration, difficulties concentrating, and argued with her mother. (R. 383). Dr. Nelson reported that Terra was either depressed or hypomanic. (R. 385). When depressed, she experienced low self-esteem, crying spells, low frustration tolerance, difficulty concentrating, forgetfulness, and insomnia. (R. 385). When hypomanic, she experienced feelings of euphoria, excessive energy, agitation, flight of ideas, difficulty concentrating, and extreme talkativeness. (R. 385). Despite these difficulties, she did have a number of friends. (R. 385). Dr. Nelson diagnosed her with bipolar disorder and termed her prognosis guarded to fair. (R. 385).

In September and October of 2006, Terra has three evaluation sessions with a psychiatrist, Dr. William Cronenwett, and a child psychiatrist, Dr. Kathleen McKenna. The doctors noted her diagnoses of ADHD, obsessive compulsive disorder, and a non-verbal learning disability. (R. 414, 417). They also noted her long list of symptoms: irritability, dysphoria, uncontrollable worry, obsessive thinking, compulsive behavior, oppositionality, stealing lying, cruelty. (R. 410). There may have been an eating disorder as well. (R. 410). She endured sadness most of the day on a typical day, along with insomnia, poor concentration, feelings or worthlessness and hopelessness. (R. 411). Her mood had been fairly low for a number of years, but there had been a little bit of recent improvement with lamitrigene. (R. 411). This led to some side effects so the plan was to replace it with Abilify and Zoloft. (R. 413). Terra had phobias of spiders, bugs, and contamination. (R. 411). She refused to go on a family vacation for fear that the hotels would be dirty. (R. 411). She had cleaning rituals. (R. 411). She sends 200 text message each day. She holds food in the side of her mouth throughout a meal. (R. 411). She has anxiety about eating away from home. (R. 411). She was frequently openly defiant, but that had improved recently.

Her behavior at school was disruptive, and her mother was often called in. Terra expressed no guilt over this. (R. 411). She picked on people because she liked having power over them. (R. 412). She experienced hyperactivity and inattention at home and at school. (R. 412). Dr. Cronenwett's and Dr. McKenna's impression was chronic depression, obsessive compulsive disorder, phobia, oppositional defiant disorder, ADHD, and learning disability. They assigned Terra a Global Assessment of Functioning score

5

of 60. (R. 419). They feared that a family history of bipolar disorder might lead her to developing this disorder in the future. (R. 419). The doctors recommended psychotherapy and medications. (R. 419).

In April and May of 2004, Terra had a series of psychological evaluations with two psychologists, Elizabeth Franks and Lisa Sorenson. At the time, Terra was refusing to take her medication because she didn't like how it made her feel. (R. 314). There was a history of treatment for an eating disorder. (R. 314). During testing, Terra was sometimes uncooperative, shutting down and refusing to continue. (R. 315). Her affect was depressed and defensive. (R. 315). She varied quickly from composed to distressed. (R. 315). She had poor frustration tolerance. (R. 315). There were clinically significant symptoms of depression and clinically concerns about self-reliance and attitude toward teachers. (R. 315-16). There was also evidence of loss of control, social stress, anxiety, feeling of inadequacy, and low self-esteem. (R. 316). Testing revealed a non-verbal learning disability, mood disturbance, and depression. (R. 322). There was evidence of ADHD, which was alleviated to some degree in a structured setting. (R. 322). Of major concern was the fact that her systems of emotional distress were on such a global level that they may well have been impacting her ability to persist in the face of frustration as well as lead to tantrums or destructive behavior. (R. 322). She was likely to experience even greater difficulties as academic demands increased. (R. 322). Her low tolerance for frustration would likely lead her to becoming overwhelmed and adversely impact her academic functioning. (R. 322). She would have to have special academic

accommodations such as taking test alone in a separate room to minimize distraction, greater structure and monitoring, and breaking assignments into small parts. (R. 323).

In September 2004, the University of Illinois Medical Center completed an evaluation of Terra. Terra claimed not to have a disorder, it was just that her psychiatrist didn't like her. (R. 328). She threw things and made messes when she was angry. She had poor relations with her peers; she said her friends were "fake." (R. 328). In seventh grade, along with her brother and sister, she tormented a girl every day until she cried because she was weak. (R. 328). Terra's mother said she was behaving better on medication. (R. 329). Diagnoses were bipolar disorder and ADHD. (R. 335).

Terra underwent a consultative evaluation with Dr. Allan Nelson that the disability agency arranged on June 28, 2005. During the interview, she was depressed and irritable, had a low tolerance for frustration, difficulties concentrating, and argued with her mother. (R. 383). Dr. Nelson reported that Terra was either depressed or hypomanic. (R. 385). When depressed, she experienced low self-esteem, crying spells, low frustration tolerance, difficulty concentrating, forgetfulness, and insomnia. (R. 385). When hypomanic, she experienced feelings of euphoria, excessive energy, agitation, flight of ideas, difficulty concentrating, and extreme talkativeness. (R. 385). Despite these difficulties, she did have a number of friends. (R. 385). Dr. Nelson diagnosed her with bipolar disorder and termed her prognosis guarded to fair. (R. 385).

Dr. David Valentiner saw Terra on June 2, 2006, and reported on her condition on July 3, 2006. He diagnosed her with obsessive compulsive disorder, conduct disorder, major depressive disorder. He did not think she suffered from a bipolar disorder, but

could not rule it out. He recommended treatment with medication and behavioral therapy. (R. 589). Because of the possibility of bipolar disorder, he recommended that treatments contraindicated by the presence of that impairment be undertaken tentatively and with careful monitoring. (R. 587). He felt Terra had a marked impairment in her ability to interact with others, and less than moderate impairments in her abilities to acquire and use information, attend and complete task and take care of herself. (R. 593-94).

## B.
## Administrative Hearing Testimony

### 1.
### Terra's Testimony

At her hearing, Terra told the ALJ that school was stressful for her because she felt pressure to talk to people all the time to maintain friendships. (R. 901). This made her tense all the time and she couldn't relax. (R. 901). Terra had been trying to go out more at the suggestion of her therapist, but this caused her anxiety because she worried she would be boring and did not know what would happen when she went out. (R. 902). Terra compulsively sent excessive numbers of text messages to her friends so that they would like her – she used to send approximately 6,000 per month, but at the time of the hearing was sending about 3,000 per month. (R. 902-03). Terra testified that she often stayed up late at night because she worried a lot during the day, so the nighttime was the only time she could relax and have peace of mind. (R. 908). She said she didn't have friends at school, but "associates" that she hung out with on the weekends. (R.912).

8

Terra was always worried about cleanliness – she testified that "I always feel like everything's like really dirty." (R. 905). Terra spent every Friday night or all of Saturday cleaning her house and would get mad at her mother and sister "when they mess it up." (R. 905). When Terra got home from school, she would take a shower and put on clean clothes, and stay in her bedroom in her bed. (R. 906). She hated taking baths because she felt the tub was never clean enough. (R. 905). She would not sit on the couch and watch television with her mother because then she would worry that everything would get dirty and she wouldn't be clean when she went to bed. (R. 906). When going to a friend's house she would not have anything to drink because she worried she would get a disease from an unfamiliar cup. (R. 905). Terra would not go to the bathroom at school due to concerns about cleanliness. (R. 906). She was afraid of bugs. She once found a spider in her room and could not sleep the entire night, and had to check her bed every night thereafter because she worried there were bugs in it. (R. 909). Another time she had to wear hoodies in her house because she was worried about bugs. (R. 909).

### 2.
### Terra's Mother's Testimony

Ms. Booker testified that, although Terra seemed to be doing "a little better right now," her level of irritability and anxiety varied on a daily basis. (R. 915). She often secluded herself in her room. (R. 915). She refused to eat at school and didn't eat all day. (R. 916). Her obsessions "go from one thing to the other." (R. 917). Terra used to be up all night cleaning, now she was up all night worried she'd miss a text message. (R. 916). Another recent obsession was with tanning; she wanted to go every day and still never felt she was tan enough. (R. 917). Ms. Booker described Terra as being very

volatile in the past, but around the time of the hearing she was "extremely depressed." (R. 926).

Terra's obsession with cleanliness interfered with their family life. (R. 921). Terra would not let anyone hug her or sit on her bed because she worried she would get dirty. (R. 925). On a recent family vacation to visit her uncle, Terra would not use the utensils for fear that they were dirty, and had to have bottled water. (R. 921). As at home, she secluded herself in the room she had at her uncle's home. (R. 921). Terra also withdrew and would not participate in activities on the vacation, probably because of stress due to the change of being in a different environment. (R. 921).

### 3.
### Medical Expert's Testimony

The medical expert in this case, Dr. Daniel Schiff, felt that Terra's anxiety and correlating need for constant reassurance significantly limited her in terms of pace. (R. 931). He further testified that, "I think she has to spend a huge amount of time getting to do the things she needs to do to not feel so scared or anxious," and that "this is a youngster who has a very complicated set of techniques in order to feel comfortable." (R. 931, 933). Her coping routines, such as cleanliness obsession or not using a bathroom away from home, "cost her a tremendous amount of thinking and effort" in order to "function pretty well." (R. 933). "She's getting where she's got to go eventually, but at tremendous cost." (R. 934). Dr. Schiff opined that there was a time when Terra's social functioning was "more marked," but he believed it was better at the time of the hearing. (R. 932). Terra's limitations with pace and paying attention approached being marked. (R. 935). Dr. Schiff testified that Terra's limitations were "cyclical," and that she was

very susceptible to load and pressure. (R. 936). Dr. Schiff concluded that Terra was a "work in progress," and that she was a "teenager going through a lot of developmental things." (R. 935).

## III.
## THE ALJ'S DECISION

The ALJ stated that Terra, born on January 19, 1990, had been an adolescent since the date of her SSI application. (R. 56). She found that he suffered from two severe impairments: A learning disability and obsessive compulsive tendencies. (R. 56). The ALJ concluded that Anna's impairment did not meet or equal the requirements of any listed impairment, specifically listing 112.06 covering anxiety disorders, stating that she had mild limitations on social functioning and perhaps moderate limitation on concentration, persistence, and pace. She struggled with anxiety and compulsive tendencies, but she functions. The ALJ added that she did well in school, engages with friends despite being constantly worried about whether they like her and whether she is doing well academically. (R 56). The ALJ, borrowing from the medical expert, called Terra a "work in progress typical of all teenagers" and found she was "functioning well." (R. 56).

The ALJ summarized the medical evidence and the testimony from Terra and her mother. In conjunction, the ALJ determined that there was no functional equivalence to a listed impairment, specifically finding that Terra had no limitation in "acquiring and using information" (R. 58-59); no more than a possible moderate limitation in "attending and completing tasks" (R 59-60); a less than marked limitation in "interacting and relating with others" (R 60-63); no limitation in "moving about and manipulating

11

objects" (R 63-64); no limitation in "caring for oneself" (R. 64-65); and no limitation in "health and physical well being." (R 65).

### IV.
### DISCUSSION

#### A.
#### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*,

270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

### B.
### Sequential Analysis

A child is disabled under the Act if she has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486-87 (7th Cir. 2007). At the outset, if the child is engaging in substantial gainful activity, her claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Next, if she does not have a medically severe impairment or combination of impairments, her claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Finally, the child's claim will be denied unless her impairment meets, or is medically or functionally equivalent to, one of the listed

13

impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486-87.

The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds she has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

## C.

A credibility finding by the ALJ is a part of every social security disability case. The ALJ has to make a specific determination as to the credibility of a claimant; the determination cannot be implied. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 489 (7th Cir. 2007); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003); *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). Here, the ALJ summarized the testimony of Terra and her mother, but did not indicate whether she believed them. The Commissioner argues that it was enough that "[t]he ALJ considered, discussed, and summarized their testimony." (*Defendant's Response*, at 9). But, clearly, an ALJ must do more than that.

In *Giles*, the ALJ did what the ALJ did here: recited some of the testimony but failed to make a credibility assessment. 483 F.3d at 488-89. The court found that the ALJ was obligated to make a finding as to credibility one way or the other. 483 F.3d at 489. "If [the] testimony was not credible, the ALJ was obligated to explain the basis of that assessment. If, on the other hand, [the] testimony was credible, the ALJ was required to explain why the testimony did not support a finding that [the claimant] was markedly limited in attending and completing tasks." 483 F.3d at 489. That's the problem here. If the ALJ believed the testimony, she didn't take the symptoms into account in her analysis. If she disbelieved it, she had to have said so and explained why. Accordingly, this matter must be remanded to the Commissioner.

The testimony at the hearing paints a more dire picture than that of a young lady who is not markedly limited in any area of functioning. She stayed awake at night

15

because it was the only chance she got to feel relaxed. Consequently, she sometimes fell asleep at school. She has an obsession with cleanliness. Consequently, she does not eat or go to the bathroom at school and she limits her interaction with her mother and sister. In terms of school work, her anxiety is such that she requires constant reassurance and guidance while doing assignments. She needed similar reassurance in her social life, maintaining near constant contact with her friends – who she calls acquaintances or fake friends – to assure herself that they like her.

The list goes on, but the general tenor of the ALJ's decision is that, despite what the medical expert called the "tremendous cost" of the many coping mechanisms and rituals Terra requires to get through an ordinary day, she was not "immobilized" and was "functioning well at home and school." (R. 60). A finding that a claimant has a marked limitation in a given area of functioning does not require a finding that she is "immobilized." A marked limitation is, instead, one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i); *Giles*, 483 F.3d at 487.

In the main, the evidence shows that Terra cannot sustain or complete activities independently. She is in an individualized education program at school designed to give her individualized attention and encouragement. This is something the ALJ ought to have mentioned when discussing Terra's performance at school, *see* 20 CFR §416.924a(a)(2)(iii); (a)(5);a(5)(iv), but, instead, the ALJ simply repeated that Terra was doing well at school. (R. 59, 60, 63, 64). Moreover, the very report the ALJ cited to support her conclusion that Terra may not even be moderately limited in her ability to

16

maintain focus and complete tasks, (R. 59), undermines that conclusion. The May 4, 2004 report from psychologists Franks and Sorenson indicates that Terra's emotional distress could impact her ability to persist in a task despite frustration and she would likely become overwhelmed. The report also stated that, at school, she would require special accommodations, such as being alone in a room away from any distractions when she was taking a test. The ALJ ignored the negative aspects of this report – and others – preferring to concentrate on whatever positive comments she could glean from the record. This, like ignoring or failing to discredit certain allegations, was inappropriate. *See O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010)(ALJ may not ignore evidence that undermines her conclusion); *Rice v. Barnhart,* 384 F.3d 363, 369 (7th Cir.2004)(same).

There are further examples of this type of analysis. For instance, in assessing Terra's ability to interact and relate to others, the ALJ noted that Terra was not "paralyzed" in her ability to socialize and that she did go out with friends. (R. 63). Again, a claimant heed not be "paralyzed" in order to have a marked limitation. 20 C.F.R. § 416.926a(e)(2)(i); *Giles*, 483 F.3d at 487. The ALJ neglected to mention that Dr. Valentiner, after evaluating Terra, found her to be markedly impaired in her ability to interact with others. (R. 62). In order to reject Dr. Valentiner's assessment, the ALJ had to explain why it wasn't entitled to any weight. *See Scott v. Astrue*, 647 F.3d 734,739 (7th Cir. 2011); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2006). The ALJ also failed to consider the fact that Terra isolated herself in her room each day and did not interact appropriately with her family. Moreover, the record shows that Terra went out and

socialized with friends at the behest of her psychiatrist. *Cf.* 20 CFR § 416.926a (k)(3)(calling for consideration of whether a claimant spontaneously pursues enjoyable activities in assessing the ability to care for oneself).

As already mentioned, the list goes on – for example, the ALJ did not consider reports from teachers who saw Terra every day, 20 CFR 416.924a(2)(iii) – but the foregoing suffices to require a remand. In addition, the plaintiff also asks for a "sentence six" remand to consider additional evidence. To merit a remand pursuant to the sixth sentence of 42 U.S.C. § 405(g), a claimant must show that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding. *Shalala v. Schaefer*, 509 U.S. 292, 296 n.2 (1993); *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003). Evidence is "material" if there is a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Jens*, 347 F.3d at 214. "New" evidence is evidence "not in existence or available to the claimant at the time of the administrative proceeding." 347 F.3d at 214.

The evidence at issue here deals with Terra's eating disorder and her need for special accommodations at school. There is no dispute that it is new; it was not in existence prior to the date of the ALJ's decision and refers to Terra's treatment and assessments after that date. Medical evidence postdating the ALJ's decision, unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement. *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008). Here, there is at least some evidence

that Terra's eating disorder was an ongoing problem dating back to well before the ALJ's decision. There were references to it in the record, although a diagnosis had perhaps not crystallized. Treatment may not have begun in earnest due to focus on the rest of the array of difficulties Terra was experiencing. Moreover, the new records of treatment from the University of Chicago Eating Disorders Clinic indicate that Terra's impairment dated back seven years. (R. 31). As such, the evidence is material and warrants consideration on remand.

The evidence pertaining to accommodations for Terra at school, however, is not material. It pertains only to her progress, or lack thereof, after the ALJ's decision. Indeed, plaintiff does not argue otherwise in her reply brief.

## CONCLUSION

The plaintiff's motion for reversal and remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion, including the consideration of additional evidence pursuant to sentence six of §405(g).

DATE: 5/4/12          **ENTERED:** _____
                                    UNITED STATES MAGISTRATE JUDGE